**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**SECURITIES AND EXCHANGE COMMISSION,**

        **Plaintiff,**

        v.                                                        10-CV-568 JCH/LFG

**UNITED AMERICAN VENTURES, LLC;
PHILLIP LEE DAVID JACK THOMAS;
ERIC J. HOLLOWELL; MATTHEW A. DIES;
INTEGRA INVESTMENT GROUP, LLC;
ANTHONY ("TONY") OLIVA;**

        **Defendants,**

**and**

**ALL AMERICAN CAPITAL CORP.,**

        **Relief Defendant.**

**<u>MEMORANDUM OPINION AND ORDER</u>**

      This matter comes before the Court on Plaintiff Security and Exchange Commission's ("SEC" or "Commission") *Motion for an Order Holding Defendants Hollowell, Thomas, and United American Ventures, LLC, Jointly and Severally Liable for Disgorgement and Prejudgment Interest, and Individually Liable for Maximum Third-Tier Civil Penalties* [Doc. 21], *Motion for an Order Holding Defendants Integra, Oliva, and Dies Jointly and Severally Liable for Disgorgement and Prejudgment Interest, and Individually Liable for Maximum Third-Tier Civil Penalties* [Doc. 23], and *Motion for Default Judgment Against Relief Defendant All American Capital Corp.* [Doc. 25]. The Court, having considered the motions, briefs, exhibits, and relevant law, and being otherwise fully informed, finds that the motions should each be GRANTED.

## BACKGROUND

The SEC filed a complaint against all Defendants on June 14, 2010, seeking to enjoin and remedy an illegal scheme to sell fraudulent and unregistered securities to the investing public. *See* Complaint [Doc. 1]. The Commission alleged in its Complaint that Defendants United American Ventures, LLC ("UAV"), Eric J. Hollowell ("Hollowell"), Philip Lee David Jack Thomas ("Thomas"), Integra Investment Group, LLC ("Integra"), Anthony "Tony" Oliva ("Oliva"), and Matthew A. Dies ("Dies") (collectively, "the Defendants") used patently false statements, including false promises that investors' funds were "100% insured against any risk of loss," to induce approximately 100 persons to invest at least $10 million in an investment program that involved the sale of purported convertible bonds. *See* Complaint ¶¶ 27, 37-38. In its Complaint, the SEC sought (i) injunctions against future violations of federal securities laws, (ii) an order directing each defendant to disgorge ill-gotten gains and to pay prejudgment interest on those gains, and (iii) assessments of civil penalties.

Contemporaneously with the filing of the Complaint, the Commission also filed the Defendants' consents to the entry of proposed judgments. [Docs. 2-7]. In the consents, the Defendants agreed to entry of an order that granted the requested injunctive relief but that deferred determination of the amounts of disgorgement, prejudgment interest, and civil penalties to such time as the Commission filed a motion quantifying the amount of monetary relief sought. The Court entered the agreed-upon judgments, which incorporated the language in the consents, on August 13, 2010. *See* Judgment as to UAV [Doc. 10]; Judgment as to Thomas [Doc. 11]; Judgment as to Hollowell [Doc. 12 ]; Judgment as to Dies [Doc. 13]; Judgment as to Integra [Doc. 14]; Judgment as to Oliva [Doc. 15]. The consent judgments provided that, in connection with the Court's calculation of the amount of disgorgement and civil penalties: (1) Defendants

are precluded from arguing that they did not violate federal securities laws as alleged in the Complaint; (2) Defendants cannot challenge the validity of the consent judgment; (3) the allegations of the Complaint will be accepted and deemed true by the Court; and (4) the Court may determine the amount of disgorgement and civil penalties on the basis of affidavits, declarations, and documentary evidence, without regard to the standards for summary judgment contained in Fed. R. Civ. P. 56(c). *See, e.g.,* Judgment as to UAV [Doc. 10] at 5.

Defendants Thomas and Hollowell founded UAV as a Delaware limited liability company in 2006.[1]  Complaint at ¶¶ 9, 10. UAV did not register any securities offering with the SEC. *Id*. ¶ 9. Between December 2006 and May 2009, Defendant Hollowell served as UAV's Portfolio Manager and was responsible for UAV's day-to-day operations. *Id*. ¶ 11. Since May 2009, Hollowell has been UAV's President, and has continued to be responsible for the company's day-to-day operations. *Id*. Defendant Thomas was UAV's President from its inception until May 2009, when he resigned to become a consultant to the company. *Id*. ¶ 10. Thomas is also the sole officer and owner of Relief Defendant All American Capital Corp. *Id*.

From July 2007 through at least November 2009, UAV raised at least $10 million from approximately 100 investors through the sale of so-called "convertible bonds." *Id*. ¶ 1. These bonds purported to pay an annualized interest rate of 25 percent, and also provided a 10 percent up-front "interest bonus," such that someone investing $100,000 in a UAV bond would purportedly receive interest on a principal amount of $110,000. *Id*. Investors were provided the option of receiving monthly interest payments or of compounding the interest and receiving payment only when the bond matures after three or four years. *Id*.

---

[1] Pursuant to the consent judgments, the allegations of the Complaint are accepted and deemed as true for purposes of the pending motions.

At the time of the events described in the Complaint, UAV purported to be a venture capital fund that invested in companies with "late stage" pharmaceutical or medical device technologies, and then either took those companies public or sold them to other, larger companies in private transactions.  *Id.* ¶ 3.  UAV's private placement memoranda ("PPM") claimed that UAV developed ventures with "pharmaceuticals and other innovations that have already achieved the most formidable (if not all) of the steps of obtaining FDA approvals." *Id.* ¶ 39(c).  The UAV "Bond Booklet" claimed that UAV had "particular strength in finding physicians and researchers with proven medications and medical devices, building the business, and taking the companies public and/or selling to major pharmaceutical companies." *Id.* ¶ 38(a). Various versions of the Bond Book also claimed that "[o]ur group's unparalleled record of success dates back to 1978, with over 40 companies taken public–mostly NASDAQ." *Id.* ¶ 38(c).  The PPM also claimed that Defendant Thomas had a doctorate in economics and a masters degree from the American Institute of Foreign Trade. *Id.* ¶ 38(g).  UAV's offering materials claimed that it was able to pay 25 percent interest on its bonds because it reliably earned far greater returns (in excess of 300 percent) on the ventures in which it invests.  *Id.* ¶ 3.

All of these representations were false.  At the time the SEC filed its Complaint, UAV had never earned a return from any investments in medical ventures, and not one of those ventures in which it was purportedly invested had an FDA-approved product.  *Id.* ¶¶ 39(b)-(c). Neither UAV nor its principals had any experience in taking medical companies public or selling them to "major pharmaceutical companies," nor had UAV or any of its principals ever taken companies public on the NASDAQ stock exchange *Id.* ¶¶ 38(a), (c).  Not only did Thomas not have the masters degree and doctorate that he claimed, but he was subject to a permanent injunction barring him from direct or indirect participation in the offer of securities in the state of

4

California.  *Id*. ¶¶ 10, 39(g).

Instead of operating as a legitimate venture capital firm, paying bondholders out of returns on its investments, UAV functioned as a Ponzi scheme, using funds from new bondholders to make monthly interest payments to existing investors who had elected to receive monthly payments rather than compounding their interest.  *Id*. ¶ 36(a).  While the PPM implied that 90 percent of all investor funds were invested in pharmaceutical and medical device ventures, only about 13 percent of funds were placed in such investments.  *Id*. ¶ 39(a).  UAV then used 15 percent of its funds to make interest payments to existing investors, 60 percent to pay purported operating expenses, and 11 percent to pay referral fees to those who recruited new investors.  *Id*.  Because investors' funds were largely diverted to other uses, investors who have not received interest payments funded by new investors stand to lose their entire investment.  UAV has been close to collapse at various times and, as of mid-December 2009, had only enough cash on hand to cover approximately one month of expenses.  *Id*. ¶ 4.  UAV's liabilities on the bonds it has issued, which began to mature in 2011, are more than 25 times greater than the funds it invested in medical ventures.  *Id*. ¶ 36(b).  Thus, it is an understatement to suggest that UAV's Bond Book misled investors when it stated that gains on its bonds are "reliable" and "guaranteed" and that "[y]our investment is 100% insured against any risk of loss."  *Id*. ¶¶ 38(b), (d).

UAV sold its bonds in a series of unregistered transactions through a network of "finders."  UAV's primary finder was Defendant Oliva and his company, Integra.  Oliva founded Integra, a New Mexico limited liability company, in approximately February of 2008.  *Id*. ¶ 13.  Integra has never been registered with the SEC in any capacity.  *Id*.  While Integra claimed that it was in the business of "educating" investors about investment options available through "self-

directed" individual retirement accounts, its true business was to steer investors to the bond programs of UAV and another company that paid Integra referral fees. *Id*. Between April and November 2009, Integra and Oliva were UAV's main source of new investors, with Integra soliciting approximately 50 investors, about half of all investors that ever invested with UAV, who purchased approximately $3.5 million in bonds. *Id*. ¶ 2. In return for these referrals, UAV paid Integra at least $340,000 in fees. *Id*.

Like UAV, Oliva and Integra knowingly misled investors in an effort to sell the UAV bonds. Integra's website and brochures stated that, in contrast to equity investments, the 25 percent return on UAV's bonds was "guaranteed" or "fixed," and that UAV was "required" to maintain assets that are more than double the value of its liabilities. *Id*. ¶ 30. Of course, there was nothing guaranteed about UAV's bonds, and UAV's liabilities on the bonds that it issued dwarfed its meager assets. Oliva had no basis for representing otherwise. Integra's website and brochures also represented that Integra had "carefully researched" the investment options that it touted, when, in fact, Oliva had made no efforts to verify any information provided to him by UAV, and had only a superficial understanding of UAV's business. *Id*. ¶ 31(a). Integra's website also contained fabricated testimonials from fictional clients and promoted the services of non-existent "professional advisors," while its brochure falsely claimed that Integra has "thousands of private, institutional, and Government clients" when, in fact, it had no more than about 150 individual clients and never had any institutional or government clients. *Id*. ¶¶ 31(b), (c).

Additionally, Oliva did not disclose to investors that Integra received a 12 percent referral fee from UAV on each new investment by an Integra client. *Id*. ¶ 32. Not only did this fee provide a strong, undisclosed incentive for Integra to steer clients toward UAV when

6

providing supposedly neutral "education" to investors, but it also affected UAV's ability to pay the promised return, as it substantially reduced the amount of the investment that UAV could put toward productive use. *Id.* Oliva knew that the representations about Integra's business were false and that he was not disclosing to investors the incentive he had to push them toward the UAV bonds or the amount of the investment in UAV bonds that would be paid to Integra as a referral fee. *Id.* ¶ 33. Oliva also either knew or was reckless in not knowing that his statements and the statements that Integra made regarding the safety of UAV's bonds and the protections in place for investors were false. *Id.*

Beginning in approximately February 2009, Defendant Dies joined UAV as the Investor Relations Associate, and took over from Defendant Hollowell the duties of dealing with Integra and other referrers, and talking with UAV's investors. *Id.* ¶ 12. Prior to joining UAV, Dies was a principal of Kimage Inter., Inc., which acted as a referrer for UAV. *Id.* Oliva and other agents of Integra put prospective investors in contact with Dies, who then communicated with them by phone, email, and mail, provided written materials to the potential investors, provided instructions on payment, and arranged for issuance of bonds. Dies processed the investments without inquiry into who the investor was, how he or she was identified, or what he or she was told about the investment. *Id.* ¶ 26.

UAV purportedly required each investor to complete and sign a form representing that he or she is an "accredited investor," as certain limited offerings made only to "accredited investors" are exempt from the registration requirements of Securities Act Section 5. *Id.* An "accredited investor" is a natural person whose individual or joint net worth at the time of purchase exceeds $1 million, or a natural person who earns over $200,000 per year (or over $300,000 per year in combination with a spouse). 17 C.F.R. § 230.501. Both Oliva and Dies

encouraged prospective investors to "check the box" indicating that their net worth was over $1 million, even after being told that it was not. Complaint ¶ 26. At least some of UAV's investors are of modest means, including a retired school teacher who invested all of a $64,000 lump sum pension payment in a UAV bond. *Id*. ¶ 27.

Only one party, Defendant Hollowell, filed a Response to these pending motions.[2] *See* Doc. 32. Defendant Hollowell's Response was filed on May 29, 2011, which was over a month after the April 25, 2011 deadline on which a response was due. *See* Doc. 29 (Notice of Briefing Complete). Pursuant to the Local Rules, "failure of a party to file and serve a response in opposition to a motion constitutes consent to grant the motion." D.N.M. LR. Civ. 7.1(b).

In addition to being untimely, Hollowell's Response is utterly deficient. While the Court construes *pro se* pleadings liberally, Hollowell's Response fails under even the most liberal construction. It consists of a brief letter in which Hollowell professes his innocence and assails the integrity of the SEC, and a 175 page report intended for UAV investors, entitled "Analyses and Resolutions of Efforts to Denigrate UAV." The Court carefully read the entire report, and finds it unresponsive to the issues raised in the SEC's motion.[3] The report, which attempts to reassure investors that their investments are legitimate and safe, and which urges investors to lodge complaints about the investigation with the SEC, Department of Justice, and Congress,

---

[2] Defendant Dies filed a motion for extension of time to respond to the SEC's motion seeking disgorgement and penalties against him, *see* Doc. 27. The Court granted him an additional 60 days, until July 26, 2011, to file his response. *See* Doc. 31. However, Defendant Dies never filed a response.

[3] The Court notes that the 178 page response violates the Local Rules of this District. *See* D.N.M. LR. Civ. 7.5 ("A response brief must not exceed twenty-four (24) double-spaced pages."); D.N.M. LR. Civ. 10.5 ("All exhibits to a motion, response, or reply...must not exceed a total of fifty (50) pages, unless all parties agree otherwise.").

fails to address the SEC's arguments and evidence concerning the amount of disgorgement of ill-gotten gains, prejudgment interest, and civil penalties, which was the subject of the motion. Under the terms of the consents, the Court may determine the issues raised in the SEC's motions "on the basis of affidavits, declarations, excerpts of sworn...testimony, and documentary evidence." Doc. 12 at 6. The Commission has submitted a declaration, documentary evidence, and legal argument indicating why the parties should be liable for disgorgement, prejudgment interest, and civil penalties, as well as the amounts for which they should be liable. The Response fails to provide any evidence to rebut these calculations or legal arguments.

In addition to failing to address the subjects at issue in the motion, Hollowell's Response violates the plain language of the consent judgment. The Response vigorously contests the allegations in the Complaint, citing evidence that purportedly vindicates him of wrongdoing. *See, e.g.*, Response [Doc. 32] at 3 (claiming that "creative reinterpretation of scraps of statements taken out of context were woven together to mischaracterize us as deceptive...and you are invited to look at the original irrefutable evidence to prove clearly which side has been deliberately and maliciously trying to make mischaracterizations."). He also claims that he signed the consent under duress. *See id*. at 20 ("Under effective duress, we reluctantly accepted the agreement from the SEC."); *id*. at 21 ("A textbook example of signing a contract under duress is being threatened with death."). As discussed previously, the consent judgment precludes Hollowell from arguing that he did not violate securities laws, precludes him from challenging the validity of the consent, and directs that, for purposes of this motion, the Court deem the allegations in the Complaint to be true. *See* Consent Judgment as to Defendant Hollowell [Doc. 12] at 5-6. Because the only Response to the SEC's motions fails to rebut any of the Commission's evidence or arguments, the Court will determine the issues raised in the

motions on the basis of the SEC's evidence and arguments.

## DISCUSSION

1.   Disgorgement

In two of its motions [Docs. 21 and 23], the Commission seeks disgorgement of ill-gotten gains from the aforementioned scheme.  Disgorgement is especially appropriate in cases of securities fraud, as it is a remedy designed both to prevent the wrongdoer's unjust enrichment and to deter others' violations of the securities laws.  *See United States v. Nacchio*, 573 F.3d 1062, 1080 (10th Cir. 2009).  Disgorgement is "an equitable remedy as to which a trial court is vested with broad discretionary powers." *S.E.C. v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006).  When the Court is calculating the proper amount of disgorgement for violation of securities laws, it need not make "an exact calculation of the defendant's profits, but only a reasonable approximation of profits causally connected to the violation.  Because such calculations are not capable of exactitude, any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." *S.E.C. v. Haligiannis*. 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) (internal quotations and modifications omitted).

   A.  Hollowell, Thomas, and UAV

A "person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010).  In a Ponzi-type scheme, the difference between the total contributions from investors and the total distribution to investors has been deemed the proper means of estimating a defendant's ill-gotten gains.  *Haligiannis*, 470 F. Supp. 2d at 385.  In this case, these Defendants are liable for net proceeds of $8,652,942.  According to documents

produced to the SEC by UAV's counsel, UAV's gross total receipts from investors totaled at least $10,214,066 during the period beginning on or about July 25, 2007, and ending on or about November 24, 2009.  *See* Declaration of SEC staff attorney Coates Lear (hereinafter "Lear Dec."), attached as Ex. A to Doc. 22, at 2 ¶ 7.  Other documents produced by UAV's counsel to the SEC show that UAV returned a total of $1,561,124 to investors in the form of "interest" payments.  *Id*. at 3 ¶ 8.  Subtracting the $1,561,124 in returns to investors from the net proceeds of $10,214,066 yields total net proceeds of $8,652,942.  *Id*.

In this case, Defendants should not be allowed to deduct referral fees, payroll, or other expenses from the net proceeds to reduce their liability for ill-gotten gains, because it would be "unjust to permit the defendants to offset against investor dollars...the expenses of running the very business created to defraud those investors."  *S.E.C. v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1114 (9th Cir. 2006).  *See also id*. at 1115 (holding that "[n]either the deterrent purpose of disgorgement nor the goal of depriving a wrongdoer of unjust enrichment would be served" if defendants who defrauded investors were allowed to "escape disgorgement by asserting that expenses associated with this fraud were legitimate"); *S.E.C. v. Benson*, 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987) (finding that the "manner in which [the defendant] chose to spend his misappropriations is irrelevant" to the disgorgement calculation).  When, as here, no aspect of Defendants' conduct can fairly be characterized as the function of a legitimate securities firm, any associated expenses are illegitimate and will not reduce the amount of disgorgement.

Hollowell, Thomas, and UAV are jointly and severally liable for the disgorgement of net proceeds.  Given the facts laid out earlier, the Court has no trouble concluding that these Defendants each had the requisite scienter to commit the fraudulent scheme alleged in the Complaint.  When, as here, "two or more individuals or entities collaborate of have a close

11

relationship in engaging in violations of the securities laws," they may properly be held "jointly and severally liable for disgorgement of illegally obtained proceeds." *Platforms Wireless Int'l.*, 617 F.3d at 1098 (internal quotations omitted). *See also S.E.C. v. First Pac. Bancorp., Inc.*, 142 F.3d 1186, 1192 (9th Cir. 1998) (after finding that individual defendant played a principal role in the fraudulent activities and had a close relationship with the corporate defendants, court held individual and corporate defendants jointly and severally liable for disgorgement of entire proceeds of fraudulent offering).

As discussed earlier, Hollowell and Thomas played principal roles in the fraudulent activities and had a close relationship with UAV. Hollowell and Thomas founded UAV. Thomas acted as UAV's president until he resigned in May 2009 to become a "consultant" to the company. Hollowell was UAV's Portfolio Manager, was responsible for UAV's day-to-day operations during the period relevant to the Complaint, and succeeded Thomas as president of UAV. These two individuals and the company were responsible for the patently false claims made to investors. The payments made to Thomas and Hollowell by UAV are additional evidence of the control that they jointly exercised over the company. UAV paid Thomas a total of $681,749 between 2007 and 2009. *See* Lear Dec. at 3 ¶ 9. UAV paid Hollowell at least $469,321 in salary and other compensation between 2007 and 2009. For all intents and purposes, Hollowell and Thomas *were* UAV, and are jointly and severally liable for disgorgement of UAV's ill-gotten gains.

    B.  Integra and Oliva

Integra and Oliva are liable for $284,039, which represents the total amount of investors' funds that UAV transferred to Integra as referral fees. According to data produced to the SEC by Integra and Oliva, Integra received referral fees of at least $284,039 from UAV between April

27 and September 14, 2009, based on funds totaling $2,424,003 invested in UAV bonds by Integra clients. *See* Lear Dec. at 4 ¶ 13.[4] In this case, Integra, like UAV, knowingly deceived investors, and Oliva played the role of ring-leader and principal in the company's fraudulent activities. Oliva founded Integra and operated it out of his home. He appeared in presentations and video testimonials on Integra's website. The relationship between Integra and Oliva was so close that they should be jointly and severally liable for disgorgement of all of the proceeds that they received as payment for luring investors into this fraudulent scheme.

    C. <u>Dies</u>

According to records produced to the SEC and the SEC's review of UAV's bank records, UAV paid Defendant Dies $54,382 between February and November 2009. *See* Lear Dec. at 4 ¶ 12. While Dies' role was secondary to that of UAV, its principals, and its referrers, he was essentially paid to facilitate UAV's sales of unregistered securities. Not only was his conduct reckless in the face of UAV's numerous unsubstantiated and false claims to investors, but he knowingly urged investors to falsify documents to make it appear that they were accredited investors. The only purpose of such falsification was to avoid complying with that part of the securities laws that seeks to protect less sophisticated individual investors. Ordering Dies to disgorge the $54,382 he received from UAV will prevent him from unjustly benefitting from wrongdoing, and will also act as a deterrent against future misconduct by others in his position.

2.    <u>Prejudgment Interest</u>

The consent judgments require each Defendant to pay prejudgment interest on the

---

[4] According to the UAV Investor List, Integra was the primary referrer on $3,455,346 in the UAV bond program, but apparently did not receive fees for all of these investments. *See* Lear Dec. at 4 ¶ 13.

disgorgements "based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." *See, e.g.*, Judgment as to Defendant UAV [Doc. 10] at 5. Based on the SEC's calculations and the IRS's method of calculating interest under 26 U.S.C. § 6621(a)(2), Defendants Hollowell, Thomas, and UAV are jointly and severally liable for prejudgment interest of $426,430, Defendants Integra and Oliva are jointly and severally liable for prejudgment interest of $15,982, and Defendant Dies is liable for prejudgment interest of $2,681. *See* Lear Dec. at 4-5 ¶ 14.

3.  Civil Penalties

The SEC seeks the imposition of maximum civil penalties against each of the individual Defendants. Identical penalty frameworks are set forth in section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). Both Acts set forth a three-tier penalty structure in which each tier provides for a penalty that shall not exceed the greater of either a specific enumerated statutory amount or "the gross amount of pecuniary gain to such defendant as a result of the violation." *See* 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B). A first tier penalty cannot exceed the greater of $6,500 or the gross amount of pecuniary gain, a second tier penalty cannot exceed the greater of $65,000 or the gross amount of pecuniary gain, and a third tier penalty cannot exceed the greater of $130,000 or the gross amount of pecuniary gain. 15 U.S.C. § 77t(d)(2).[5] A second tier penalty is appropriate if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard for a

---

[5] Although the statute itself provides for enumerated penalties not to exceed $5000, $50,000, and $100,000, respectively, this statutory amount has been adjusted for inflation pursuant to the Debt Collections Improvement Act of 1996, Pub. L. No. 104-134, § 31001s (April 26, 1996). The inflation-adjusted penalties reflected above apply to violations occurring after February 14, 2005. *See* 17 C.F.R. § 201.1003.

14

regulatory requirement." 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B). A third tier penalty is appropriate if the requirements for a second tier penalty are met and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*.

The Court must determine the amount of the civil penalty, if any, "in light of the facts and circumstances" of the particular case. *Id*. In determining the amount of a civil penalty, courts have looked to various factors, including: (1) the egregiousness of the violations at issue; (2) the degree of the defendant's scienter; (3) whether the violations were isolated or recurrent; (4) a defendant's failure to admit wrongdoing; (5) whether the defendant's conduct created substantial losses or the risk of substantial losses to investors; (6) defendant's lack of cooperation and honesty with authorities; and (7) whether an otherwise appropriate penalty should be reduced due to the defendant's demonstrated current and future financial condition. *See, e.g., S.E.C. v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 568 (S.D.N.Y. 2009) (listing factors).

    A. <u>Hollowell and Thomas</u>

Upon consideration of the factors listed above and the facts of this case as alleged in the Complaint and as accepted as true by the Court for purposes of these motions, the Court finds that imposition of third tier civil penalties against Defendants Hollowell and Thomas is warranted. As previously discussed, these Defendants engaged in egregious violations of the Securities and Exchange Acts with scienter and recklessness. Their illegal offering scheme involved fraud, deceit, and numerous false representations to investors, and it resulted in millions of dollars in investor losses. Further, Defendants engaged in these acts repeatedly, over the course of more than two years, during which time they preyed on unwitting investors.

Because UAV operated like a Ponzi scheme, paying "returns" to original investors by using money provided by new investors rather than through legitimate returns on investments, the scheme created a significant risk of substantial losses to the 100 individuals who invested over $10 million in UAV's offering.

Moreover, not only did Hollowell's Response not provide any evidence to rebut the SEC's calculations of ill-gotten gains, but the report that he attached to the Response only strengthens the case for third tier penalties. This report, which appears to be directed to investors, and which was issued after the scheme was exposed and he entered into a consent decree with the SEC, shows that Hollowell is unrepentant. The report, in which Hollowell professes innocence of all wrongdoing and insists that the actions against him and UAV are the result of the SEC's malfeasance, makes the claim that UAV has succeeded in the "explosive creation of true economic value, turning less than $15 million into an estimated $500 million." Response [Doc. 32] at 17. He also falsely claims that UAV's primary assets are not frozen, that UAV is free to raise additional investment capital, that new ventures are "presenting opportunities for profits within the next three to six months," and that he "is personally guarantying [sic] UAV's obligations to its investors and venture principals." *Id*. at 19, 133, 136. In addition, Hollowell's report claims that "[i]n separate negotiations, and based on standard practices, our attorney has assured us that we conclusively will not pay any penalties." *Id*. at 19. Of course, this claim is also blatantly false, as Hollowell had already acknowledged in his signed consent that the Court "shall order" a civil penalty. Consent Judgment as to Hollowell [Doc. 12] at 5 ¶ 6.

As architects and proponents of this scheme, Defendants Hollowell and Thomas easily meet the statutory requirements for third tier penalties. As previously discussed, the calculation

16

of total net proceeds from the scheme was $8,652,942. The Court could order a penalty reflecting the full amount of pecuniary gain to each Defendant. However, in the interest of maximizing recovery for the victim investors, and given the significant financial outlay required by the orders for disgorgement and payment of prejudgment interest, the Court finds that the dual functions of punishment and deterrence will be adequately served by imposing penalties of $1 million each on Defendants Hollowell and Thomas.

    B. Oliva

Although he did not design the scheme, Defendant Oliva perpetuated it by knowingly or recklessly misleading investors regarding the nature of UAV's business and the safety of the offered investments. In addition, Oliva failed to disclose the substantial fees he and his company were receiving for steering investors toward UAV, and he significantly misrepresented Integra's business experience and client base. These actions involved fraud, deceit, or deliberate or reckless disregard of a regulatory requirement and created a significant risk of substantial loss to other persons. As such, Oliva is liable for a third tier penalty. Given his lesser involvement, the Court finds that the goals of the penalty provisions will be served by ordering Defendant Oliva to pay a $130,000 penalty.

    C. Dies

Although further removed from the scheme than Hollowell, Thomas, or Oliva, Dies' actions in facilitating the sale of unregistered securities still served the purposes of the scheme. Not only was his conduct reckless in the face of UAV's numerous unsubstantiated and false claims to investors, but he knowingly urged investors to falsify documents to make it appear that they were accredited investors, thus enabling UAV to reach a class of presumably less sophisticated individual investors that SEC regulations were in place to protect. Thus, Dies'

conduct also meets the criteria for a third tier penalty. The Court finds that a penalty in the gross amount of pecuniary gain that Dies received as a result of his misconduct, reflected in the $54,382 salary he received from UAV, is sufficient.

4.      Default Judgment Against Relief Defendant

Plaintiff's Complaint also seeks to recover ill-gotten gains transferred from UAV to relief Defendant All American Capital Corp. ("All American") for the benefit of Defendant Thomas. *See* Complaint ¶¶ 15, 57-59. All American did not answer the Complaint or otherwise file a responsive pleading. *See* Doc. 19. Therefore, on November 19, 2010, the Clerk of Court entered default against All American. *See* Doc. 20. Upon entry of default, the well-pleaded allegations of the Complaint relating to liability are taken as true. *See Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1125 (10th Cir. 2003). Plaintiff now seeks a default judgment that directs All American, as a relief defendant, to disgorge $592,529 in ill-gotten gains. *See* Doc. 25.

In a securities enforcement case, a so-called relief defendant or nominal defendant may be joined as a party to aid in the recovery of proceeds that are the subject of the litigation. *See S.E.C. v. George*, 426 F.3d 786, 798 (6th Cir. 2005); *S.E.C. v. Cavanaugh*, 155 F.3d 129, 136 (2d Cir. 1998). Where a relief defendant has not been accused of any securities violations, a court may order equitable relief against an entity if it received ill-gotten proceeds and fails to demonstrate a legitimate claim to those proceeds. *See Cavanaugh*, 155 F.3d at 136. Such a power prevents defendants from circumventing "the SEC's power to recapture fraud proceeds[] by the simple procedure of giving [those proceeds] to friends and relatives." *Id*.

At the time of the Complaint, Thomas was All American's sole officer and shareholder. Complaint ¶ 10. Thomas provided IRS forms 1099 to the SEC during its investigation. *See* Lear Dec. ¶ 10. According to those forms and the SEC's analysis of UAV's bank records, UAV

transferred at least $592,529 to All American between 2007 and 2009, including $547,529 of Thomas' compensation. *Id*. The payments from UAV to All American were derived entirely from investor contributions to UAV. Complaint ¶ 15. Because All American has no legitimate claim to the ill-gotten funds received from UAV, it is liable for disgorgement of $592,529, and the Court will enter a default judgment to that effect.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion for an Order Holding Defendants Hollowell, Thomas, and United American Ventures, LLC, Jointly and Severally Liable for Disgorgement and Prejudgment Interest, and Individually Liable for Maximum Third-Tier Civil Penalties* [Doc. 21] is GRANTED. Defendants Hollowell, Thomas, and United American Ventures, LLC are jointly and severally liable for disgorgement of $8,652,942, with such disgorgement liability reduced by the amount, if any, paid by Defendants Oliva, Integra Investment Group, LLC, and Dies, and relief Defendant All American Capital Corp. Defendants Hollowell, Thomas, and United American Ventures, LLC are also jointly and severally liable for prejudgment interest of $426,430. In addition, Defendants Hollowell and Thomas are each liable for civil penalties of $1 million.

**IT IS FURTHER ORDERED** that Plaintiff's *Motion for an Order Holding Defendants Integra, Oliva, and Dies Jointly and Severally Liable for Disgorgement and Prejudgment Interest, and Individually Liable for Maximum Third-Tier Civil Penalties* [Doc. 23] is GRANTED. Defendants Oliva and Integra Investment Group, LLC are jointly and severally liable for disgorgement of $284,039 and for prejudgment interest of $15,982. In addition, Defendant Oliva is liable for a civil penalty of $130,000. Defendant Dies is liable for disgorgement of $54,381 and for prejudgment interest of $2,861. In addition, Defendant Dies is

liable for a civil penalty of $54,382.

**IT IS FURTHER ORDERED** that Plaintiff's *Motion for Default Judgment Against Relief Defendant All American Capital Corp.* [Doc. 25]. is GRANTED.  Relief Defendant All American Capital Corp. is liable for disgorgement of $592,529.

                                      **UNITED STATES DISTRICT JUDGE**